Filed 7/16/26  L.R. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| L.R.,<br><br>  Petitioner,<br><br>  v.<br><br>THE SUPERIOR COURT OF MERCED COUNTY,<br><br>  Respondent;<br><br>MERCED COUNTY HUMAN SERVICES AGENCY,<br><br>  Real Party in Interest. | F091342<br><br>(Super. Ct. Nos. 24JP-00059-B & C)<br><br>**OPINION** |

### THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Mark V. Bacciarini, Judge.

Michelle Jorgensen, under appointment by the Court of Appeal, for Petitioner.

No appearance for Respondent.

Forrest W. Hansen, County Counsel, and Ann Hanson, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]    Before Levy, Acting P. J., Snauffer, J. and DeSantos, J.

Petitioner L.R. (mother) seeks an extraordinary writ (Cal. Rules of Court,[1] rule 8.452) from orders made at a contested 18-month review hearing (Welf. & Inst. Code,[2] § 366.22), where the juvenile court terminated family reunification services as to her two minor children, A.O. and E.J., and set a section 366.26 hearing for July 2, 2026, as to A.O.

Mother contends the juvenile court erred by declining to extend reunification services to 24 months and requests we vacate the order terminating services.

We deny the petition and the stay on the section 366.26 hearing is lifted.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Referral and Petition*

In June 2024, the Merced County Human Services Agency (agency) received a referral for allegations of physical harm arising from an incident where mother charged toward her then 17-year-old daughter, J.O.,[3] with a knife, while threatening to kill her.

At the time of the incident, which occurred in May 2024,[4] J.O. had been living with the maternal grandmother as part of a prior safety plan, and her siblings, then 13-year old A.O. and then four-month-old E.J., the subjects of this writ proceeding, lived with mother.

On the day of the incident, J.O. accompanied the maternal grandmother to mother and the children's home because the maternal grandmother was going to watch E.J.

---

[1]     Further rule references are to the California Rules of Court.

[2]     All further undesignated statutory references are to the Welfare and Institutions Code.

[3]     J.O. is not a subject of this writ proceeding.  Facts pertaining to her are included to the extent they are relevant to the understanding of A.O. and E.J.'s case and the issues raised in mother's petition.

[4]     The delay between the incident and the referral was explained in later testimony by J.O.  According to J.O., she told a friend of hers about the incident and sent her the video she had taken of the event.  Two to three weeks later, the friend told one of J.O.'s adult relatives, and the relative called law enforcement, leading to the June 2024 referral.

2.

Mother and J.O. started arguing when mother thought J.O. was taking things from the home. During the investigation, mother admitted to telling J.O. to "get the f[***] out," and trying to push J.O. out of the house. The maternal grandmother intervened, and mother went into the kitchen to put away dishes. According to mother, she became angry in the meantime because J.O. was "cussing and saying things to [mother] and that she was going to record [mother]." Mother left the kitchen to try to take J.O.'s phone away from her and, because she was still doing dishes, had a knife in her hand. She reported that she threw the knife back into the kitchen before reaching J.O. She then proceeded to try to take J.O.'s phone from her, and the two began to wrestle over the phone until the maternal grandmother broke it up.

J.O.'s report veered from mother's in that according to her, mother went to the kitchen specifically to grab the knife, then charged out of the kitchen while stating she was going to kill J.O. J.O. also reported previous physical abuse by mother and domestic violence between mother and E.J.'s then-alleged father, A.J.

Part of the incident was captured on video, and a screenshot of the video was attached to the agency's detention report. The screenshot appears to depict mother approaching the camera with an angry expression while holding a knife and pushing past who appears to be the maternal grandmother.

As a result of the incident, mother was arrested, and A.O. and E.J. were detained by law enforcement and released to the agency's care for out-of-home placement.

On June 4, 2024, the agency filed a juvenile dependency petition on behalf of A.O. and E.J., alleging they came within the juvenile court's jurisdiction under section 300, subdivision (b)(1) (failure to protect) because the incident with J.O., domestic violence between mother and A.J., and mother's untreated mental health/anger issues put A.O. and E.J. at risk of physical harm. The petition further alleged that A.O. came within the juvenile court's jurisdiction under section 300, subdivision (g) (no provision for support), as the whereabouts of her father, F.O., were unknown. F.O. and A.J. were listed in the

3.

petition as A.O. and E.J.'s alleged fathers, respectively, and both fathers were later elevated to presumed status.

### *Detention, Jurisdiction, and Disposition*

At the detention hearing conducted on June 5, 2024, the juvenile court ordered the children to remain detained.

The agency subsequently presented evidence that mother had an extensive history of violent and abusive behavior prior to the initiation of the dependency proceedings. First, she had child welfare referrals dating back to 2011. In 2011, a referral alleging emotional abuse and general neglect was substantiated due to domestic violence between mother and F.O., and a voluntary family maintenance case was opened but later closed due to the family refusing services. In 2018, it was alleged that mother took J.O. to a known drug house, engaged in domestic violence in her presence, and involved her in criminal activity; the allegation of general neglect was substantiated. In 2022, it was alleged that J.O. was placed on a section 5150 hold and subsequently determined she could be discharged, at which point mother refused to pick her up and would not allow any other family member to pick her up; the allegation of general neglect was substantiated. Additionally, there were multiple separate allegations that mother physically abused J.O. that were deemed inconclusive.

Mother also had a criminal history, including a previous conviction for stalking an ex-boyfriend, for which she was ordered to take a batterer's treatment program as a result. In 2011, mother was convicted of assault with a deadly weapon arising out from an incident where she hit F.O. with a frying pan and was ordered to complete a batterer's treatment program for a second time. Also in 2011, she was convicted of violating a restraining order.

Finally, in 2019, the father of mother's 15-year-old son, who was not a subject of the dependency proceedings, filed for full custody and a domestic violence restraining

4.

order in family court.  According to court documents, mother had threatened to kill her son and his siblings and hit her son with a closed fist, splitting his lip.

At the jurisdiction/disposition hearing conducted on September 9, 2024, mother presented no evidence but requested jurisdiction not be taken or, in the alternative, that she be offered family maintenance services.  J.O. wished to address the court and testified she wanted to go home.  She explained that mother was not trying to stab her with the knife and was only trying to get J.O.'s phone from her.

The juvenile court sustained the petition and found A.O. and E.J. were described by section 300, subdivision (b)(1) and that A.O. was additionally described by section 300, subdivision (g).  The court declared the children dependents and removed them from mother's physical custody.  In ruling, the court acknowledged the video of the incident.  The court noted that mother approaching J.O. "looking very angry" with the knife was "very troubling" and not "a minimal type of incident" that should be ignored, particularly given that the incident did result in a physical altercation as well as the history of physical altercations between mother and J.O.  The court was concerned about the risk that matters could escalate again to "physical and verbal violence going on, and particularly, with a deadly weapon in the hand of" mother.

Mother and A.J. were granted reunification services, and F.O. was denied services, as his whereabouts were unknown.  The juvenile court ordered supervised visitation to occur and granted the agency discretion to advance it to unsupervised.  Mother's case plan included general counseling, domestic violence services, and parenting classes.  Her case plan objectives were to (1) "[c]onsistently, appropriately and adequately parent your children"; (2) "not behave in a manner that is verbally, emotionally, physically, or sexually abusive or threatening"; and (3) "[c]omply with medical or psychological treatment."  (Boldface omitted.)

### *Six-Month Reporting Period and Status Review Hearing*

Over the course of the subsequent reporting period, mother started participating in parenting classes, completed a 14-week domestic violence support group, and regularly visited with the children with no concerns.  She had not had any encounters with law enforcement.  In November 2024, she began having unsupervised weekly visits with the children.  It was reported that despite participating in services, however, mother had "not been able to demo[ns]trate any learned techniques."  It was reported she was having unauthorized visits with the children, was "harassing" A.J., and during a conversation with the social worker in December 2024, became "aggressive" with the social worker and blamed J.O. for the removal of the children.  For these reasons, the agency moved mother back to supervised visits prior to the six-month review hearing.  Ahead of the hearing, the agency was recommending reunification services be continued as to mother and A.J. and terminated as to F.O.

Mother set the six-month review hearing for contest, as she was requesting family maintenance services, and the hearing was conducted on March 4, 2025.

The social worker testified that the reason the agency did not believe return of the children was appropriate at that time was because during conversations where the social worker was attempting to discuss mother's case plan, mother "immediately" got "agitated," cut the social worker off, and became "hostile."  She explained that mother had been progressing in her services, and when mother was having unsupervised visits with the children, there were no concerns about the visits.  The reason mother's visits were moved from unsupervised back to supervised was due to mother's inability or unwillingness to take complete responsibility for the reason the children were removed and her aggression toward the social worker and others.  The agency was requesting mother start anger management classes.  There were concerns that, based on mother's history of violence and her failure to take accountability for her actions toward J.O., there was still a risk of mother physically abusing A.O. and E.J.

Mother testified that she remembered the December 2024 conversation with the social worker where she was alleged to have become hostile; at the time, she was driving and running multiple errands. She became frustrated during the call because it appeared to her there was not going to be enough time for the children to be returned to her by the six-month review hearing, which mother attributed in part to social worker delay. She began asking questions of the social worker, and the social worker may have felt attacked because mother was driving and was speaking to the social worker on speaker phone. Mother denied being disrespectful, attacking, or threatening. Mother attempted to pull over to speak to the social worker without distraction, but the social worker was no longer willing to continue the call. She explained that when she told the social worker the case started "because of [J.O.]," she was referring to the "situation between [her]self and [J.O.]," and she was just trying to understand if the case would be dismissed once J.O. turned 18.

Mother testified she had learned from her services and took "full accountability" for the violence leading to the present case as well as past violence, though she denied hurting her older son. When asked about the May 2024 incident, mother explained that she did not try to attack J.O. with the knife; she already had the knife in her hand because she was doing dishes. She lost control of her emotions, and because she already had the knife in her hand, she "did hold it in a threatening manner trying to threaten [J.O.] to leave. But [she] never had intentions to use it or hurt [J.O.]" When asked to clarify if it was her intent to threaten J.O. with a knife, she responded, "I plead the Fifth."

Mother admitted she had already taken batterer's intervention classes twice, but that this time was different because at the time of the prior services, she was younger, was in denial she needed help, and the classes were not set up in a way she was receptive to.

During argument, minors' counsel noted that the children's stated desires were to be returned to mother, but she did not believe it was in their best interest. She requested

7.

mother undergo a psychological evaluation "based on all the evidence the [juvenile c]ourt has heard today, including the [c]ourt observing her demeanor and behavior," and counsel's opinion that "her issues are much more deep-seeded than what some anger management classes are going to fix."

In ruling, the juvenile court stated that mother appeared to be "blaming everybody but herself for the situation she finds herself in" and had a lengthy history of violence. The court found the return of the children would pose a substantial risk of detriment to them and continued reunification services. The court left the issue of a psychological evaluation "up to the [a]gency." Mother's case plan was updated to include anger management classes. The court terminated reunification services for F.O.

### 12-Month Reporting Period and Status Review Hearing

During the next reporting period, mother continued to work on services. She completed a "Positive Discipline" class and a "12 Hour-High-Conflict Co-Parenting/Co-Parenting Without Conflict" class and participated in the Home Visitors Program but was inconsistent with visits with the children, so the agency was unable to observe learned techniques.

Mother also continued to demonstrate problems controlling her emotions and was reported to get agitated with the social worker to the point of the social worker being unable to communicate with mother. Mother had several police reports against her from members in the community during the reporting period, arising from difficulty controlling her emotions, including driving by a community member and calling her a "bitch"; cutting off another community member while driving and telling him to "count his days," following him, threatening to put him in jail and kill him, as well as driving by his home and making threats to him online; and harassing A.J.

Mother underwent a mental health evaluation with clinician Brett Green, during which she denied having anger, domestic violence, parenting or mental health concerns. Green observed that mother "demonstrated impulsivity, low level of locus of control in

8.

measurement and appeared emotionally charged at times. She is likely to be defensive, blame others, and/or justify her actions." He recommended that mother (1) see her general practitioner or a psychologist for medication review and management for correct diagnosis to rule in/out mood disorder and blood work to determine medication management dosages; (2) attend 20 to 24 weeks of therapy; and (3) continue attendance in her case plan services.

A contested 12-month review hearing was conducted on November 12, 2025. The social worker testified that mother's visitation attendance had improved and the agency now considered her consistent with visits, and the visits were going well. There were still concerns, however, with mother's behaviors and how she presented herself in the community, including making threats. Mother's attorney elicited that one of the confidential community members that mother had reportedly threatened was likely J.O.'s former teacher who had started a romantic relationship with J.O.

Mother testified she was participating in recommended sessions with Brett Green and had started to be able to label her emotions and recognize physical signals so that she could assess what was going on with her and take appropriate action. She felt like the classes and her case plan were helping her. She denied threatening to kill anyone because she was out of town on the day in question. As for her interactions with social workers, she testified they were "minimal." She admitted to sometimes speaking too quickly so she does not forget when she has a thought, and that is perceived negatively by the social worker.

On cross-examination, mother was asked about the incident that initiated the dependency case. She stated she "had a knife in [her] hand for a few seconds when [she] went to go grab the phone out of [J.O.'s] hand but released the knife." The knife was in her hand because she was putting dishes away. She admitted the screenshot of the video taken of the incident looked threatening and that anyone holding a knife can be perceived as threatening.

9.

Mother again requested family maintenance services. Minor's counsel stated that A.O. wished to return home, but counsel did not feel it was in her best interest at the time and joined in the agency's recommendation.

The juvenile court found return of the children would pose a substantial risk of detriment to the children and ordered reunification services to continue for mother and A.J., noting mother was "lucky" the agency was "offering her more time, quite frankly."

***18-Month Reporting Period and Status Review Hearing***

During the subsequent reporting period, the agency observed that mother "continue[d] to get upset when confronted about her lack of insight into how her behaviors negatively affect her children" and "continue[d] to refuse to take accountability or responsibility for her choices and behaviors, always provide an excuse or deflect onto something else." Mother was working on completing her anger management classes and sessions with Brett Green. Mother continued to have weekly supervised visits with the children and was observed to be attentive and engaged with both A.O. and E.J., even though it was reported "[a]t times," that A.O. appeared to be disengaged.

The agency was recommending mother's services be terminated as to both children as she "ha[d] not been able to meet the case plan objectives nor … demonstrate the capacity and ability to provide for the children's safety, protection, physical, and emotional needs." According to the agency, mother had "failed to take accountability for her actions, both past and present, and ha[d] not demonstrated a change in behavior." The agency opined that mother "put[] more effort into making excuses for her choices and deflecting the blame on to others and ha[d] not made the necessary changes needed to reduce the risk of abuse that she poses towards her children."

As to A.O., the agency was recommending a section 366.26 hearing be set, and as to E.J., the agency was recommending he be returned to A.J. on family maintenance services. Additionally, as to E.J., the agency filed a motion for transfer to Monterey County, as that is where A.J. resided.

The contested 18-month review hearing was conducted on March 17, 2026 and March 19, 2026. Mother's position was "that if [m]other is ready for unsupervised visitation, then reunification is not complete and services should not be terminated." Mother's attorney continued, "[u]nsupervised visits are part of the progressive reunification process, and that's what we're asking for today."

The children's care provider and maternal stepgrandmother testified that she had seen a "huge change" in mother, as she had taken all of her classes and "given her life to the Lord." She was more patient, kind, and focused on the children's needs.

The social worker testified mother had completed her course of treatment with Brett Green. Green's follow-up report did not show any concerns with mother. Mother completed her anger management classes as well as lab work to determine if she had any underlying health issues that required medication. The agency still had concerns, however, regarding mother's behavior. The social worker had only seen a slight change in mother since detention and had observed that mother had not realized that anger had brought her into these situations and that she still lacked insight. The agency was concerned because mother's anger and aggression had escalated over many years culminating in threatening J.O. with a knife. A.O. was at particular risk because she was around the same age as J.O. was when mother started showing aggression toward her, and mother had demonstrated a pattern of physically abusing the oldest child in her care. The social worker testified it was not safe to return either child to mother or for either child to have unsupervised visitation with mother.

Mother's therapist Richard Halverson-Muenzer testified that mother had been attending therapy with him on and off for almost a year but had been attending weekly since September. Mother discussed the dependency case with him and that her anger was an issue. Halverson-Muenzer was doing dialectical behavioral therapy, or DBT, with mother to help her pause and reflect and not act impulsively in situations. He felt that mother had made progress and grasped the concept of slowing down before responding,

11.

particularly in the six weeks prior to the hearing. He "[m]ost definitely" recommended that she continue therapy.

On cross-examination, Halverson-Muenzer was asked if mother talked to him about why her children were detained, and he responded that he could not recall the "exact details" but understood that there were some "differences of opinion on if she was adequate to parent her children, and that's why they were taken away." When pressed on whether mother was able to "admit … the egregious circumstances under which her children were removed," Halverson-Muenzer responded that mother admitted to making "a lot of mistakes," but as a clinician, he was focused on treating someone for the issue they were requesting help with and to help them do better.

When asked if he was aware that mother "attacked her daughter with a knife and said she was going to kill her," Halverson-Muenzer responded that he and mother had talked about the incident and "[t]hat's not exactly the way [mother] explained it. She explained she had a knife, and she did approach her daughter, but she did not intend to hurt her, even though she was trying to get her attention." When asked about whether mother had discussed with Halverson-Muenzer different aspects of mother's past experience with violence, Halverson-Muenzer responded that he was not sure "where you're going with the questioning." He explained he did not feel past history was relevant to his testimony; he was testifying " that this client is in therapy, is trying to make changes, and I've seen changes, and I am encouraged by, you know, the conversations and some of the things that we've been talking about." He planned on working with her "for quite a while longer," as they "have a fair amount of work to still do," including unpacking childhood trauma.

A.O. testified that she wanted to be returned to mother's care. She had seen mother show more patience and less anger. On cross-examination A.O. was asked about a past verbal argument between mother and A.J. that she and E.J. witnessed, which included mother screaming at A.J. A.O. stated that mother's behavior in that instance

12.

had "no" impact on her. She described that it was "nothing new with the arguments between [mother] and [A.J.] because of just how things were then" and she tended to block mother and A.J. out and focus on E.J. because he was crying at the time.

Mother, through counsel, asked for continued reunification services. Minors' counsel stated though A.O. wished to return to mother, she felt termination of reunification services was in the children's best interest. Minor's counsel argued that no exceptions applied to justify extension of services to 24 months.

The juvenile court found by a preponderance of the evidence that return of the children to mother's custody would create a substantial risk of detriment to the children as mother had failed to complete her court-ordered treatment program, noting the case was at 21 months at the time of the hearing. The court found by clear and convincing evidence that reasonable services were offered to mother and that mother had failed to make substantive progress in her case plan. The court ordered reunification services terminated. The court denied the agency's request for transfer of E.J.'s case without prejudice. As to A.O., the court set a section 366.26 hearing, and as to E.J., the court set a family maintenance review hearing.

## DISCUSSION

### I.     The Juvenile Court Properly Terminated Reunification Services

Mother contends the court erroneously terminated her reunification services; she requests her reunification services be reinstated and continued to include unsupervised visitation and that she be given the opportunity to progress to return of the children on family maintenance services.

We start our discussion with the proposition that the burden is on mother to overcome the presumption of correctness and to demonstrate reversable error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.)

Mother makes multiple arguments she asserts are grounds for vacating the juvenile court's order terminating her reunification services, but many of them are not adequately

supported by the law applicable to 18-month status review hearings.  For the reasons we explain below, we have framed mother's primary argument as follows:  the juvenile court's finding that mother was provided reasonable services was not supported by sufficient evidence because she had not progressed to unsupervised visitation.[5]

### A.        18-Month Status Review Hearings

By the time a dependency case reaches the 18-month status review hearing, or permanency review hearing, the juvenile court has few options.  Generally, the court must either return the child to parental custody or set a section 366.26 hearing to select a permanent plan.  (See § 366.22, subd. (a).)

Section 366.22, subdivision (b), however, allows the juvenile court to continue reunification services beyond 18 months, not to exceed 24 months, under specific enumerated circumstances, and mandates it to continue reunification services for six months if the court finds the parent was not provided reasonable reunification services.  (§ 366.22, subd. (b)(1) & (2).)  None of the enumerated circumstances which allow for discretionary continuance apply to the present case.[6]  As such, under the circumstances of

---

[5]        To the extent we do not expressly discuss any point raised in mother's petition, we have considered it and rejected it.  (See *People v. Clair* (1992) 2 Cal.4th 629, 691, fn. 17.)

[6]        The enumerated exceptions relate only to a parent who:  (1) is "in a court-ordered residential substance abuse treatment program"; (2) "was either a minor parent or a nonminor dependent parent at the time of the initial hearing"; or (3) "recently discharged from incarceration, institutionalization, or the custody of the United States Department of Homeland Security."  (§ 366.22, subd. (b).)  A parent described by the above must also meet other criteria not relevant here because mother is not described by the above nor has she contended in her petition or below that she is.

We note mother uses language that appears to reference the narrowly defined discretionary exceptions set forth in section 366.22, subdivision (b).  For example, on pages 5 through 6 of her petition, she states that the juvenile court failed to consider whether "there existed a substantial probability of return if services were continued."  Mother does not acknowledge that, at the 18-month review hearing stage, this factor would only be relevant if she were described by the narrow categories we set forth above.  (See § 366.22, subd. (b)(3) [to extend services, a court must find substantial probability

14.

this case, the only possible path for the juvenile court to have continued reunification services would be if it were to find mother was not provided reasonable services, in which case it would be required to continue the case.[7]

As we explain, mother has not shown the court erred by finding mother was provided reasonable services.

### B. The Juvenile Court's Finding that Mother Was Provided Reasonable Services Was Proper

We review the juvenile court's finding that mother was provided reasonable services for substantial evidence, bearing in mind the clear and convincing standard of proof. (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1346.) We view the

---

of a safe return defined in part by "ability … to complete [a] substance abuse treatment plan … or … treatment plan postdischarge from incarceration, institutionalization, or detention, or following deportation"].)

[7] Mother alludes to the fact that the juvenile court could have continued the case pursuant to section 352, which allows for the continuance of a dependency hearing upon a showing of good cause so long as the continuance is not contrary to the interest of the child. (See § 352, subd. (a).) She relies on *Michael G. v. Superior Court* (2023) 14 Cal.5th 609 to support this suggestion and her assertion that the court was required to apply a best interest standard in making its determination as to whether to continue reunification services.

Mother's reliance on *Michael G.* is misplaced. *Michael G.* dealt with a former version of section 366.22. The *Michael G.* court concluded, based on the language of the former version, that continuance under section 352, the source of the "best interest" standard referred to by the *Michael G.* court and by mother, was the only way services could be extended for parents who did not receive reasonable services and who did not fall into the narrow categories described in footnote 6, *ante*. (See *Michael G.*, at pp. 627–630, 630–631, 632.) The Legislature has since amended section 366.22, subdivision (b) to generally require the court to extend reunification services if it finds reasonable services had not been provided. (§ 366.22, subd. (b)(2)(A), added by Stats. 2023, c. 714, § 2.5.)

Because mother did not seek to continue the hearing under section 352, either verbally or by the statutorily required method of written notice filed at least two court days prior to the date set for the hearing (§ 352, subd. (a)), we do not address her arguments that invoke section 352, and instead focus solely on whether she received reasonable reunification services under section 366.22, subdivision (b)(2).

record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)

The standard in determining reasonableness of services is whether they were reasonable under the circumstances. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) The child welfare agency must " 'make a good faith effort' " in implementing the case plan. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 424.) It must identify the problems leading to the loss of custody, offer services designed to remedy those problems, maintain reasonable contact with the parents during the course of the case plan, and make reasonable efforts to assist the parents in areas where compliance proves difficult. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) Determining the reasonableness of services also includes a review of the parents' willingness to participate in services. (*In re Lynna B.* (1979) 92 Cal.App.3d 682, 702.)

Mother's sole complaint about the services provided is that her visitation did not progress to unsupervised.

Visitation is an integral part of a reunification plan. "Visitation shall be as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).) In the absence of evidence showing the parents' behavior has jeopardized or will jeopardize the child's safety, the agency cannot limit and impede the progression of visitation services to a parent. (See *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1419.) The focus of the court however must remain on the best interests of the children " ' "and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm …." ' " (*Serena M. v. Superior Court* (2020) 52 Cal.App.5th 659, 673.)

The relevant period for our review is the period between the 12-month review hearing and the 18-month review hearing—November 12, 2025 to March 17, 2026. (See *Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018 [appeal from the most recent

16.

order in a dependency matter may not challenge earlier orders for which the time to file an appeal has passed].) We must first place mother's claim in context.

At the jurisdiction/disposition hearing on September 9, 2024, mother was ordered to have supervised visits with the children. In November 2024, the agency exercised its discretion to provide unsupervised visits, but in January 2025, she was moved back to supervised visits. At the six-month review hearing on March 4, 2025, the juvenile court found reasonable services had been provided, continued the supervised visitation order, and added anger management to mother's case plan. Mother did not appeal from this order, and the order is now final.

During the reporting period between the six- and 12-month review hearings, mother showed difficulty controlling her emotions as evidenced in part by incidents of aggressive behavior toward community members in public and the results of her mental health evaluation. Though mother was participating in her services, her visitation was inconsistent, and the agency was unable to determine whether she was applying what she was learning. By the time of the 12-month status review hearing conducted on November 12, 2025, mother's visits had stabilized and they were going well, but there were still concerns about mother's behavior. The juvenile court again found reasonable services had been provided and continued the supervised visitation order. Mother did not appeal from this order, and the order is now final.

This brings us to the period between the 12- and 18-month review hearings—the focus of this writ proceeding. According to the agency's reporting during this period, mother was still having problems controlling her emotions in conversations with social workers. Given the reason for department intervention, mother's history, and mother's pattern of minimizing the risk her anger posed to her children, this constituted evidence that mother continued to pose a danger to the children in an unsupervised setting, particularly to A.O. as she got older. We acknowledge that by the time of the hearing, mother had finished the anger management classes and sessions with Brett Green, but this

17.

progress was very recent at the time of the hearing and mother has not explained how it supports her contention that she was entitled to unsupervised visits during the reporting period, prior to the hearing.

Mother briefly contends that she was treated unfairly compared to A.J., as she did not progress from unsupervised visits, but he was granted family maintenance services as to E.J. despite "also demonstrating aggressive behavior toward the social worker in the twelve-month report and failing to even provide psychological reports to the agency." Mother contends this indicates "preferential treatment and bias." Mother fails to support this claim with legal authority or accurate citations to the record, and we reject it without further discussion. An appellate court is "not required to develop a party's argument for it" (*LAOSD Asbestos Cases* (2023) 87 Cal.App.5th 939, 955) nor to independently "search the record for evidence that supports the party's statement" (*Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826, fn. 1).

In sum, mother has not established that unsupervised visitation was in line with the best interests of the children and, as such, she has not established that her not being progressed to unsupervised visits constituted a lack of reasonable services. Accordingly, we conclude the juvenile court's finding that she was provided reasonable services is supported by substantial evidence.

## II. Other Issues

### A. Substantial Evidence Supported the Juvenile Court's Detriment Finding

Mother's only request in this writ proceeding is that she be granted continued reunification services. She notably does not request return of the children; she does not directly argue that the juvenile court erred by finding that return of the children would create a substantial risk of detriment to them nor does she state the point under a separate heading. (See rule 8.452(b)(2) [writ petition memorandum "must state each point under a

18.

separate heading or subheading summarizing the point and support each point by argument and citation of authority".]

Some of the arguments in her petition, however, indirectly touch on the issue. Though we are not required to, for mother's benefit, we briefly address them. (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 ["Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading."].) After considering mother's arguments, we conclude the court's detriment finding was supported by substantial evidence.

Mother compares her case to *In re Jasmine G.* (2000) 82 Cal.App.4th 282 and *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738. These cases stand for the proposition that a parent's perceived failure to internalize parenting skills despite participation in services is not substantial evidence to support a detriment finding precluding the return of a child. A social worker or psychologist's opinion that services were ineffective must be supported by "*evidence* rather than an emotional response.' " (*Blanca P.*, at p. 1750.)

Here, we recognize that mother participated in the services set forth in her case plan. The basis of the juvenile court's detriment finding was not that she failed to complete services, but that despite her participation in services, the evidence still showed she was unable to provide a safe home for the children in part due to her continued minimization or lack of understanding of how she put her children at risk of physical abuse. Mother had a long history of difficulty with controlling her anger and other emotions and behaving in threatening and violent ways toward ex-partners, social workers, members of the community, and most significantly, her older son and J.O. These behaviors continued well into the dependency proceedings, and mother showed a pattern throughout the proceedings of minimizing and/or justifying her behavior and never, from our review of the record, acknowledged the particulars or extent of the risk she posed to A.O. and E.J. In our view, the clear risk she posed to her younger children

19.

was of harm through exposure to this behavior and violence in the home, as well as potential future physical abuse of them even though they were not yet direct targets. Against this backdrop, the evidence from the social worker's reporting and testimony at the 18-month review hearing that mother still was having trouble controlling her emotions and did not appear to have gained insight was significant and supported the court's finding that risk of detriment still existed.

We do not find, as mother suggests, that the court's finding was improperly based on emotional, unsupported statements by the social worker. Rather, in our view, much of the evidence corroborating the social worker's opinions and supporting the court's findings at the 18-month review hearing was elicited from mother's own witness, her therapist Halverson-Muenzer. His testimony suggested that during their sessions, mother minimized the May 2024 incident which initiated the proceedings in the same manner that she had throughout the proceedings, including her own testimony in earlier hearings, which the court was able to personally observe.

The court's detriment finding was supported by substantial evidence.

### B. Mother Has Not Established Error With Regard to the Juvenile Court's Denial of the Agency's Motion for Transfer

Mother briefly contends the juvenile court erred by denying the agency's request to transfer E.J.'s case to Monterey County but does not support this assertion with any legal authority or reasoned argument.

We reject this claim without further discussion. (See rule 8.452(b)(2) [extraordinary writ petition must support each point by argument and citation of authority]; see also *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [a party's "conclusory presentation, without pertinent argument or an attempt to apply the law to the circumstances of this case, is inadequate," and the contention will be found by the appellate court to have been abandoned].)

20.

**DISPOSITION**

The petition for extraordinary writ is denied. This court's order staying the section 366.26 hearing is lifted. This court's opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A).